# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| 160 LEE STREET CONDOMINIUM HOMEOWNERS' ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>MID-CENTURY INSURANCE COMPANY,<br><br>Defendant. | CASE NO. C17-1170-MJP<br><br>ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT;<br><br>GRANTING IN PART AND DENYING IN PART MOTIONS TO STRIKE |

THIS MATTER comes before the Court on Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 23) and Defendant's Cross-Motion for Summary Judgment (Dkt. No. 27) and Motions to Strike (Dkt. Nos. 27, 39). The Court has reviewed the Motions (Dkt. Nos. 23, 27), the Responses (Dkt. Nos. 27, 32), the Replies (Dkt. Nos. 35, 36) the Surreply (Dkt. No. 39), and all related papers. The Court declines to hear oral argument on the matter.

ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT; - 1

**Background**

Plaintiff 160 Lee Street Condominium Homeowners' Association ("160 Lee Street") is the owner of a condominium in Seattle, Washington (the "condominium") that was damaged by fire. At the time of the fire, the condominium was insured by Defendant Mid-Century Insurance Company ("Mid-Century"). While the parties do not dispute that the condominium was covered on the date of the fire, they disagree as to whether the terms of the insurance policy (the "policy") required Mid-Century to cover various repair, replacement, and incidental costs. Plaintiff filed this action seeking declaratory judgment as to Mid-Century's liability for these costs, and alleging claims for (1) breach of contract; (2) insurance bad faith; (3) violation of the Washington Consumer Protection Act ("WCPA"); and (4) violation of Washington's Insurance Fair Conduct Act ("IFCA").[1] (Dkt. No. 22 at ¶¶ 4.1-20.)

***The Mid-Century Policy*:** The policy provided "all risk" coverage, effective February 1, 2015 through February 1, 2016. (Dkt. No. 23 at 2.) Relevant provisions of the policy include the following:

A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

    1. COVERED PROPERTY

        Covered property, used in this policy, means . . . Building and structure described in the Declarations . . .

    2. PROPERTY NOT COVERED

        Covered Property does not include: . . . Fences, walls, walks, driveways . . .

    3. COVERED CAUSES OF LOSS

---

[1] This case was initially filed in King County Superior Court in June 2017, but was removed by Mid-Century in August 2017. (See Dkt. No. 2, Exs. A, B; Dkt. No. 4.)

Risks of Direct Physical Loss unless the loss is [excluded or limited herein].

. . .

    5.   ADDITIONAL COVERAGES

. . .

Extra Expense

  (a)   We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

  (b)   Extra Expense means expense incurred:

    (i)   To avoid or minimize the suspension of business and to continue "operations" . . .
    (ii)  To minimize the suspension of business if you cannot continue "operations".
    (iii) To:
        i.   Repair or replace any property; or
        ii.  Research, replace or restore the lost information on damaged "valuable papers and records".

We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. . . .

(Dkt. No. 24, Ex. 1 at 12-14, 17.) A policy endorsement titled "Washington Changes – Condominium Policy" reflects a "Property Loss Condition – Loss Payment" which provides:

In the event of loss or damage . . . at our option, we will either:
 (1) Pay the value of the lost or damaged property;
 (2) Pay the cost of repairing or replacing the lost or damaged property;
 (3) Take all or any part of the property at an agreed or appraised value; or
 (4) Repair, rebuild or replace the property with other property of like kind and quality.

However, Option (3) will not apply if you are required by state law to repair or replace the property; and Option (4) will not apply if the property is not being repaired or replaced in accordance with state law.

Subsection (7) of Wash. Rev. Code Ann. Section 64.34.352 (1990) provides that any portion of the condominium for which insurance is required shall be repaired or replaced unless:
  (i)  The condominium is terminated;

    (ii) Repair or replacement would be illegal under any state or local health or safety statute or ordinance; or

    (iii) 80% of the unit-owners vote not to rebuild. . . .

(Id. at 10.) A further "Extended Replacement Cost Endorsement" (the "ERC") provides:

  A. When this endorsement is attached to your policy, we will pay up to 125% of the Limits of Insurance shown on the Declarations Page to repair or replace covered buildings, damaged by a covered loss . . .

  C. Loss settlement under this endorsement will not exceed the lowest of the following:

    1. The replacement cost of the damaged part of the building for equivalent construction and use on the same premises.

    2. The amount necessarily spent to repair or replace such property intended for the same occupancy and use. . . .

(Id. at 40.)

  ***The Fire at the 160 Lee Street Condominium*:** On July 2, 2015, the condominium was damaged by fire. (Dkt. No. 23 at 4-5.) The layout of the condominium is relevant to this dispute, and is summarized as follows: The condominium is comprised of two three-story residential structures—an east tower and a west tower—built atop an underground parking garage. (Id. at 4.) The towers are separated by a portion of the roof of the underground garage, which also serves as a courtyard and deck area. (Id.) At the time of the fire, the entire condominium was clad in light blue vinyl siding. (Id.) The fire resulted in substantial damage to both the west tower and the roof membrane of the underground parking garage.[2] (Id. at 4, 16.)

  Mid-Century has paid a total of approximately $2.4 million for repairs and reconstruction, but has denied payments of approximately $300,000 due under the policy. (Id. at

---

[2] There is a dispute as to whether portions of the siding on the east tower were also damaged by the fire. While Plaintiff claims that there was "some damage" to the siding on the east tower that "owners believe was caused by the fire," the record is not conclusive on this issue, and the Court does not rely upon these claims in reaching its ruling. (See Dkt. No. 23 at 9; Dkt. No. 25, Exs. 4, 5.)

2, 5-6.) Plaintiff now moves for summary judgment on its claims for (1) breach of contract; (2) insurance bad faith; (3) violation of the WCPA; and (4) violation of IFCA. (Id. at 9-25.) Defendant cross-moves as to each of these claims. (Dkt. No. 27.)

## Discussion

### I. Legal Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant bears the initial burden to demonstrate the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A genuine dispute over a material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 253 (1986). On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

Where a case involves a dispute as to an insurance policy, "[t]he insured bears the burden of showing that coverage exists; the insurer that an exception applies." Mut. of Enumclaw Ins. Co. v. T & G Constr., Inc., 165 Wn.2d 255, 268 (2008) (citation omitted). An insurance policy is to be construed as a contract, the interpretation of which being a matter of law. State Farm Gen. Ins. Co. v. Emerson, 102 Wn.2d 477, 480 (1984). "The entire contract must be construed together in order to give force and effect to each clause" and must be enforced "as written if the language is clear and unambiguous." Wash. Pub. Utils. Dists.' Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam Cty., 112 Wn.2d 1, 10 (1989). If, on the other hand, "a policy provision on its face is fairly susceptible to two different but reasonable interpretations, the policy is ambiguous and the

court must attempt to discern and enforce the contract as the parties intended." Transcontinental Ins. Co. v. Wash. Pub. Utils. Dists.' Utils. Sys., 111 Wn.2d 452, 456-57 (1988).

The Court must "liberally construe insurance policies to provide coverage whenever possible." Bordeaux, Inc. v. Am. Safety Ins. Co., 145 Wn. App. 687, 694 (2008) (citation omitted). "The policy is construed as a whole, and should be given a fair, reasonable, and sensible construction as would be given the average person purchasing insurance." Grange Ins. Co. v. Brosseau, 113 Wn.2d 91, 95 (1989) (internal quotation marks and citation omitted). Terms that are not defined within must be given their "plain, ordinary, and popular" meaning, Bordeaux, 145 Wn. App. at 694 (citation omitted), and any ambiguities are to be "strictly construed against the insurer." Findlay v. United Pac. Ins. Co., 129 Wn.2d 370, 374 (1996); see also Transcontinental, 111 Wn.2d at 457 (ruling that where policy terms are ambiguous, the Court is to "apply a meaning and construction most favorable to the insured, even though the insurer may have intended another meaning."). "Coverage exclusions are contrary to the fundamental protective purpose of insurance and will not be extended beyond their clear and unequivocal meaning. Exclusions should also be strictly construed against the insurer." Bordeaux, 145 Wn. App. at 694 (internal quotation marks and citation omitted).

**II. Breach of Insurance Contract**

Plaintiff contends that Mid-Century was required to cover (1) the cost to match replacement siding on the east and west towers; (2) the cost to replace the garage roof membrane; and (3) various "extra expenses," including the cost to retain an owner's representative and an attorney, and commercial supervision costs invoiced by its general contractor. (Dkt. No. 23 at 9-20.) Mid-Century responds that each of these costs are not covered under the terms of the policy. (Dkt. No. 27 at 5-15.)

1                  **a. Exterior Siding**

Plaintiff contends that Mid-Century breached the contract by failing to cover the cost to replace the exterior siding on both the condominium's east and west towers. While Mid-Century agreed to cover replacements for the west tower, its adjuster apparently was unable to find replacement siding that matched the existing siding on the east tower. (Dkt. No. 23 at 9.) Plaintiff contends that Mid-Century was therefore required to cover the cost of replacement siding for both towers, such that it would be "compatible" or "equivalent." (Id.)

Mid-Century responds that a covered loss did not occur at the east tower, and that the policy "contains no terms providing that *undamaged* property is covered in any way, or must be replaced to ensure aesthetic uniformity." (Dkt. No. 27 at 5-6) (emphasis in original). Accordingly, Mid-Century contends that replacement of the east tower's siding would "result in a windfall to the insured." (Id. at 8.) Mid-Century further contends that because neither the Washington Condominium Act, RCW 64.34.352, nor the ERC Endorsement apply, there is no requirement that replacement siding be "compatible" with or "equivalent" to the existing siding, and any damaged property should be replaced with property of "like kind and quality" or "similar kind and quality." (Id. at 10-13.)

The Court finds that Mid-Century's interpretation of the policy is incorrect as a matter of law. There is no dispute that the policy requires Mid-Century to cover, at a minimum, the cost to "[r]epair, rebuild, or replace the property with other property of *like kind and quality*." (Dkt. No. 24, Ex. 1 at 10 (emphasis added); see also Dkt. No. 27 at 12-13.) The term "replace" is not defined in the policy, and therefore must be given its plain and ordinary meaning. Bordeaux, 145 Wn. App. at 694. The Merriam-Webster Online dictionary defines "replace" to mean "to restore to a former place or position." See Merriam-Webster Online, *available at*

https://www.merriam-webster.com/dictionary/replace (last visited Apr. 24, 2018). The term "property" is defined in the policy to include the "[b]uilding and structure described in the Declarations" (i.e., the condominium at 160 Lee Street). (Dkt. No. 24, Ex. 1 at 12.) Accordingly, the Court finds that any "replacement" must necessarily restore the *entire* condominium to its condition before the fire—a condition in which there was no visual mismatch between the east and west towers. See, e.g., Nat'l Presbyterian Church, Inc. v. GuideOne Mut. Ins. Co., 82 F. Supp. 3d 55, 60 (D.D.C. 2015) (holding that ambiguous policy language required insurer not only to replace damaged portions of exterior, but to cover the cost of matching with non-damaged portions).

Further, to the extent that the policy is ambiguous as to replacement coverage, any ambiguity is to be construed against Mid-Century so as to give effect to the protective purpose of insurance. Findlay, 129 Wn.2d at 374; Bordeaux, 145 Wn. App. at 694.

### b. Garage Roof Membrane

Plaintiff contends that Mid-Century breached the contract by failing to cover the cost to repair the roof membrane on the condominium's underground garage.

While the parties previously disputed whether the roof membrane—which both seals the underground garage against moisture intrusion and also serves as an above-ground courtyard and walkway—was subject to the policy's $2,500 limit for a "walk," Mid-Century has conceded coverage as to this claim. (Dkt. No. 23 at 16-17; Dkt. No. 27 at 13-14.)

### c. Extra Expenses

Plaintiff claims that Mid-Century breached the contract by failing to cover the cost of various "Extra Expenses" including (1) the cost to retain an owner's representative; (2) the cost to retain an attorney; and (3) commercial supervision costs, none of which "would have been

have been necessary but for the fire." (Dkt. No. 23 at 18-20.) Mid-Century responds that these costs were not incurred "as a direct cost of 'repair[ing] or replac[ing] any property'" or to "avoid or minimize the suspension [of the HOA] operation" but rather "were indirect soft costs" not covered by the policy's Extra Expense provision. (Dkt. No. 27 at 16-17.)

The disputed "Extra Expenses" are as follows: First, Plaintiff retained its existing property manager, Southlake Associates ("Southlake"), to represent its owners in negotiations with various contractors and to work with Mid-Century regarding the insurance claim. (Dkt. No. 23 at 18-19.) Second, Plaintiff retained an attorney "to ascertain its legal responsibilities to the various unit owners and negotiate a reconstruction contract" with its contractor. (Id. at 19.) Third, Plaintiff's general contractor submitted an invoice for a total of 1,950 hours of commercial supervision. (Id.)

With regard to the first and second categories, Mid-Century responds that they are "soft costs" outside the limited coverage for Extra Expense. (Dkt. No. 27 at 17-18.) The Court finds that Mid-Century's interpretation of the policy is incorrect as a matter of law. The "Extra Expense" provision in the policy does not identify "soft costs," and Mid-Century's argument that these costs are excluded is based upon a selective reading of the policy. The policy defines Extra Expense to mean expenses incurred either "[t]o avoid or minimize the suspension of business and to continue 'operations'" or to "[r]epair or replace any property" within 12 consecutive months after the date of direct physical loss or damage. (Dkt. No. 24, Ex. 1 at 17.) There is no dispute that, but for the fire, Plaintiff would not have incurred any of these categories of costs.

With regard to the third category, Mid-Century concedes that contractor supervision is covered under the policy. (Id. at 18-19.)

Having found that Mid-Century is liable for the costs of (1) replacing siding for both the east and west towers; (2) repairing or replacing the garage roof membrane; and (3) extra expenses, the Court concludes that its failure to cover these costs constitutes a breach of the insurance contract, and GRANTS summary judgment in Plaintiff's favor on this claim. The Court's ruling extends to liability only, as there are outstanding disputes of fact as to the specific amounts necessarily incurred by Plaintiff and currently owed by Mid-Century for each of these costs.

### III. Insurance Bad Faith, IFCA, and WCPA Claims

Plaintiff's insurance bad faith, IFCA, and WCPA claims turn on the reasonableness of Mid-Century's conduct, including the reasonableness of its interpretation of the policy. See, e.g., Transcontinental, 111 Wn.2d 452, 470 (1988) ("A denial of coverage based on a reasonable interpretation of the policy is not bad faith, and even if incorrect, does not violate the [WCPA] if the insurer's conduct was reasonable.") (citations omitted); Perez-Crisantos v. State Farm Fire and Cas. Co., 187 Wn.2d 669, 680 (2017) (IFCA "creates a cause of action for first party insureds who were 'unreasonably denied a claim for coverage or payment of benefits"). Whether an insurer's conduct was reasonable must be determined "in light of all the facts and circumstances of the case." Indus. Indem. Co. of the Northwest, Inc. v. Kallvig, 114 Wn.2d 907, 920 (1990).

Although the Court finds Mid-Century's interpretation of the policy to be incorrect, it does not find it so "unreasonable, frivolous, or unfounded" that "reasonable minds could reach but one conclusion" with regard to bad faith, or the IFCA or WCPA claims. Smith v. Safeco Ins. Co., 150 Wn.2d 478, 484-85 (2003) (citations omitted). Instead, the Court concludes that the reasonableness of Mid-Century's conduct is a question of fact properly reserved for a jury, and DENIES both parties' motions for summary judgment as to these claims.

## IV. Motions to Strike

Mid-Century moves to strike the Declarations of Steven Stolle (Dkt. No. 23), Phil Pajaczek (Dkt. No. 25), and Roger Howson (Dkt. No. 37), and various exhibits attached thereto. (See Dkt. No. 27 at 2-3; Dkt. No. 39.) When ruling on a motion for summary judgment, the Court may only consider admissible evidence. Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002). Authentication is a "condition precedent to admissibility," which is satisfied by evidence sufficient to support the claim. Id. A document may be authenticated by a witness with knowledge of the document or by any other manner permitted by Federal Rules of Evidence 901(b) or 902. Under Rule 901, authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901(a). Rule 901(a) requires that the proponent "make only a prima facie showing of authenticity so that a reasonable juror could find in favor of authenticity." United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991) (internal quotation marks and citation omitted).

### a. Declaration of Steven Stolle

Mid-Century contends that all but one of the exhibits attached to Mr. Stolle's declaration is inadmissible due to lack of foundation, lack of personal knowledge, and the rule against hearsay. (Dkt. No. 27 at 2-3.) Mr. Stolle is counsel of record for Plaintiff. (Dkt. No. 24 at ¶ 1.) Exhibits 3, 4, 5, 6, 7, 15, and 18 are documents from Mid-Century's own claim file. Each is printed on Mid-Century's letterhead, and was produced by Mid-Century during discovery. (Id. at ¶¶ 5-9, 17, 20; Exs. 3-7, 15, 18); see also Malijack Prods., Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 889 n.12 (9th Cir. 1996). Exhibits 9, 10, 11, 13, 14, 16, and 17 are correspondence between Mr. Stolle and Mr. Bartlett, Mid-Century's claims adjuster. (Id. at ¶¶ 11-13, 15-16, 18-19; Exs. 9-11, 13-14, 16-17.) Exhibit 2 is a Seattle Fire Department investigation report (Id. at ¶ 4; Ex. 2.) Exhibit 8 is a site diagram prepared by ITEL

Laboratories. (Id. at ¶ 10; Ex. 8.) Exhibit 12 is a site diagram prepared by Case Forensics. (Id. at ¶ 14; Ex. 12.)

The Court DENIES the Motion to Strike the Declaration of Steven Stolle and exhibits attached thereto in its entirety. The Court finds that Exhibits 3-7, 9-11, and 13-18 are adequately authenticated by supporting circumstantial evidence and are not hearsay. Fed. R. Evid. 901(b)(4), 801(d)(2). While the Court agrees that Mr. Stolle fails to establish the authenticity of Exhibits 2, 8, and 12, the Court does not rely on these exhibits, which are either immaterial or duplicative of other submissions.

### b. Declaration of Phil Pajaczek

Mid-Century contends that various portions of and exhibits attached to the Declaration of Phil Pajaczek are inadmissible due to lack of foundation, lack of personal knowledge, and the rule against hearsay. (Dkt. No. 27 at 2-3.) Mr. Pajaczek is the Principal of Southlake, Plaintiff's property management company. (Dkt. No. 25 at ¶¶ 1-2.) While Mid-Century attaches a redlined version of Mr. Pajaczek's declaration "with the inadmissible portions" stricken" (Dkt. No. 29, Ex. 1), it provides no explanation as to why these portions and related exhibits are inadmissible.

The Court DENIES the Motion to Strike the Declaration of Phil Pajaczek and exhibits attached thereto in its entirety. Mid-Century "made no effort to explain how any individual exhibit was inauthentic and . . . made no effort to identify any hearsay statement." See Seaway Props., LLC v. Fireman's Fund Ins. Co., 16 F. Supp. 3d 1240, 1256-57 (W.D. Wash. 2014). In any event, the Court does not rely on the portions of Mr. Pajaczek's declaration or exhibits objected to by Mid-Century, which are either immaterial or duplicative of other submissions.

### c. Declaration of Roger Howson

Mid-Century contends that the Declaration of Roger Howson is both untimely and improper under Federal Rule of Evidence 702. (Dkt. No. 39 at 2-3.)

As Mr. Howson's expert declaration includes evidence presented for the first time in Plaintiff's Reply, the Court GRANTS the request and does not rely upon Mr. Howson's declaration in ruling on summary judgment. See Docusign, Inc. v. Sertifi, Inc., 468 F. Supp. 2d 1305, 1307 (W.D. Wash. 2006) (noting "[i]t is well established that new arguments and evidence presented for the first time in [a] Reply are waived."); see also Eberle v. City of Anaheim, 901 F.2d 814, 818 (9th Cir. 1990) (noting "[t]he general rule is that [litigants] cannot raise a new issue for the first time in their reply briefs.").

### Conclusion

Having found that Mid-Century's policy provides coverage for the costs of (1) replacing siding for both the east and west towers; (2) repairing or replacing the garage roof membrane; and (3) extra expenses, the Court GRANTS summary judgment in Plaintiff's favor as to the breach of contract claim. Having found that the reasonableness of Mid-Century's conduct and its interpretation of the policy present questions of fact properly reserved for a jury, the Court DENIES summary judgment as to the insurance bad faith, IFCA, and WCPA claims. The parties are directed to proceed with discovery and prepare for trial as to (1) the specific amount that Mid-Century owes under the policy with regard to the breach of contract claims and (2) the reasonableness of Mid-Century's conduct and its interpretation of the policy. The Court DENIES Mid-Century's motions to strike the Declarations of Steven Stolle and Phil Pajaczek, and GRANTS the motion to strike the Declaration of Roger Howson.

1     The clerk is ordered to provide copies of this order to all counsel.

2     Dated April 27, 2018.

*[signature]*

The Honorable Marsha J. Pechman
United States Senior District Court Judge